## Case No. 7,866.

### In re KLEIN.

[2 N. Y. Leg. Obs. 185; Pa. Law J. 344.]

District Court, D. Missouri. 1843.[1]

CONSTITUTIONAL LAW—BANKRUPT ACTS—EX POST FACTO LAWS.

The act of congress [5 Stat. 440], so far as it undertakes to discharge a debtor from debts contracted before the passage of the act, without payment, and to discharge his future acquisitions of property from liability to those debts, without the consent of a given majority of his creditors, is unconstitutional.

[Disapproved in Re Reiman, Case No. 11,673; Re California Pac. R. Co., Id. 2,315.]

[In the matter of Edward Klein, a bankrupt.]

WELLS, District Judge. This was a petition in bankruptcy, by a debtor, under the act of congress, entitled "An act to establish a uniform system of bankruptcy throughout the United States, approved 19th August, 1841." The petitioner was declared a bankrupt, and the final hearing of his petition set for this term; and now, upon the final hearing, the petitioner asks a decree of this court, decreeing him a full discharge from all his debts, and a certificate thereof, as provided by said act. It now becomes necessary for the court to decide a very grave and important question,—important, as it regards the number of persons interested, the amounts in controversy, and the principles involved in the decision. It is, the authority of this court to make the decree asked, discharging the petitioner from his debts; and this makes it necessary to decide upon the constitutionality of the act, or the power of congress, under the constitution, to 'pass the act, and require the court to make the decree.

A preliminary question is to be disposed of: Whether it is the duty of the court to decide on the constitutionality of an act of congress, when a question arises in a cause before it; and, if, in the opinion of the court, the act be repugnant to the constitution, it should so decide. The constitution of the United States is declared to be the supreme law of the land. All the power which the congress possesses is derived from it. If an act be repugnant to the constitution, it would seem, it could not become a law; if a law, it must be obeyed; if it be repugnant or in opposition to the constitution, and you obey it, you would violate or disregard the constitution, which, then, could not be regarded and obeyed as the supreme law. The judges are sworn to support the constitution, and of course to support it as the supreme law. If they decide against its requirements, they could hardly be said to support it as the supreme law. They must, therefore, obey the constitution, and disregard an act that is repugnant to it. To illustrate this: A is the owner of a tract of land. An act of congress is passed, by which the land is granted to B. B brings suit for the land, and claims under the act granting it to him. A defends, under the constitution, alleging that congress had no authority, under the constitution, to pass the act granting his land to B. The court must decide the cause. Again: A is the owner of a tract of land, and sells it to B. B gives his bond to A for the purchase money. An act of congress is passed, declaring that B shall be wholly released and discharged from his debt; and, that a certain court shall, on his application, grant the discharge; and that no suit shall be brought or maintained in any court to recover the debt. Here, again, either of the courts before whom the questions arise, must decide on the authority of congress to pass the act, by which A is deprived of his debt. If the constitution provides that the land of A shall not be granted to B—and that a debt B may owe A shall not be discharged without payment—any act to the contrary, the constitution being a supreme law, must be invalid—and the court must decide the cause, and must support the claim or defence which the constitution maintains, and disregard the act. These were the principles intended to be established by the framers of the constitution; and are in accordance with established judicial principles. Fed. No. 44–78; Morbury v. Madison [1 Cranch (5 U. S.) 137] 1 Pet. Cond. R. 268; Vanhorn's Lessee v. Dorrance, 2 Dall. [2 U. S.] 304; 1 Kent, Comm. 313.

Is this act of congress, under which the petitioner claims a discharge from his debts, authorized by the constitution? In order to determine this, it will be necessary to notice several of its provisions. It provides, in substance, that any person, whether a trader or not, who is indebted, except in a few enumerated cases, may file his petition in the district court of the United States, for the benefit of the act, at any time he may please, without the consent or action of any of his creditors, and obtain, by a decree of the court a discharge from all his debts. This decree is to be had without the consent of any of his creditors being required, even if they do not participate in the proceedings, or receive a dividend from the property. The decree is to be deemed a full and complete discharge from all his debts, contracts, and engagements, proveable under the act, whether contracted before or after the passage of the act. If he

---

[1] [Reversed in Case No. 7,865.]

has property, he surrenders it; if he has none, it is the same thing as it regards his discharge.

In examining this question, we should ascertain, if possible, what was the object the convention had in view by inserting the provision. The phraseology adopted would indicate a part of the object, "t establish uniform laws on the subject of bankruptcies throughout the United States." It was apprehended, at least, that they would not be uniform, unless congress had the power to make them so. In addition to this, we are told by Mr. Madison (Fed. No. 42), that "the power of establishing uniform laws of bankruptcy, is so intimately connected with the regulation of commerce, and will prevent so many frauds where the parties, or their property, may lie or be removed into different states, that the expediency of it seems not likely to be drawn into question." To have a system that would be uniform, and would prevent frauds, &c., seems to have been the object. The proposition was referred to the committee of detail, of which Mr. Rutledge was chairman, and reported as it now stands in the constitution. In ascertaining what were the mischiefs to be remedied, or the objects to be effected, the convention, doubtless, looked to the condition of things, and of course to the institutions and laws of the various states. But for a definition of that, or any other legal term—or to ascertain the nature and extent of the powers they were about to grant, by particular words or phrases, they would hardly look to the laws of the states. There was far less intercourse in those days than at present. There were no steamboats, railroads, macadamized roads. The laws of the several states could not have been generally known to the members of the convention of the several states; even the best lawyers could not have been acquainted with the laws of the states in which they did not practice. They are not so, even at this day. If they had been acquainted with the laws of all the states, to which would they have referred in preference to all the rest, for definitions, or the meaning and extent of legal terms? The convention well knew it was making a constitution for the whole Union; that the terms they might use should be known and understood, and must be interpreted and explained in every state. They were, therefore, exceedingly exact in the use of words and phrases—every word of legal import, every phrase was weighed and considered; and a phrase of only a few words was frequently referred to a committee, as was done in this case, and examined and reported on. They were frequently obliged to use legal terms. They were making a law. This was a legal term—bankrupt laws. What was to be done to prevent confusion and uncertainty; and, above all, to mark exactly, and with legal precision, the extent of the powers they were about to

grant; that neither more nor less power might be granted than was desired?

Our ancestors had removed from England. The United States had then lately been English colonies, and part of the British empire. The English laws and system of jurisprudence, had been substantially adopted in every state in the Union. Every person at all conversant with legal subjects, and every lawyer, of course, was acquainted with the English laws. This knowledge was equally extensive in every state. It is so to this day. Here, then, was a law with which all were acquainted, and to which all could refer. There could be no mistake, if reference was made to it for the meaning of terms. And to it they did accordingly refer. We do so to this day. Ask a lawyer the meaning of a legal term, and where does he look for an answer? To the statutes of Massachusetts, or Georgia, New York, Pennsylvania, or Virginia? Certainly not. In most instances he would look in vain. The proposition in regard to bankruptcies was made by Mr. Chas. Pinckney, of South Carolina, in the words we now find in the constitution—it was referred to the committee of detail, consisting of Mr. Rutledge, of South Carolina, Mr. Randolph, of Virginia, Mr. Gorham, of Massachusetts, Mr. Ellsworth, of Connecticut, and Mr. Wilson, of Pennsylvania; and they reported it in the words in which it was referred. Now, several of these states never had anything like a bankrupt law. To which, then, did they refer, or could they refer to ascertain the meaning and extent of the terms they were employing? The lawyer, if he is not familiar with the term, will refer to Blackstone's Commentaries, or to an English Law Dictionary, where he will readily find it. If he referred to the statutes of the different states, he might get as many definitions as there were states, supposing they had any law on the subject.

The first continental congress, in 1774, declared, among other things, "that the respective colonies were entitled to the benefit of such of the English statutes as existed at the time of their colonization, and which they had, by experience, found to be applicable to their several local and other circumstances." 1 Jour. Cong. (Phila. Ed. 1800) p. 28. Many of the states had adopted, in a body, the English statutes, only excepting such as were local to that kingdom, or not applicable to their situation. The supreme court of the United States, in Patterson v. Winn, 5 Pet. [30 U. S.] 233, says that "the English statutes passed before the emigration of our ancestors, and applicable to our situation, and in amendment of the law, constituted a part of the common law of the country. We know, as a matter of history, that the members of the convention who took part in the debate, were intimately acquainted with the English laws. The committee above mentioned, possessed some of the most eminent lawyers in America; and who have

held the highest legal stations. Reference was often made by them to the English laws, for the meaning of terms or phrases they were using. Thus, when it was proposed to define and limit treason against the United States, Mr. Randolph and Mr. Ellsworth. (two of the committee), Mr. Madison, Mr. Mason, and Mr. Gouverneur Morris, all referred to the act of parliament of 25 Edw. III.; and the convention at last adopted the precise phraseology of that act. Madison Papers, 1770. Again: When the phrase "ex post facto" was under consideration, Mr. Dickerson stated that, on examining Blackstone's Commentaries, he found the term related to criminal cases only. Id. 1450. And the supreme court has since confined the signification of the term to the definition given by Blackstone. Mr. Hamilton, who was a member of the convention, in speaking of the "habeas corpus" provision in the constitution, refers to and quotes Blackstone's Commentaries. Fed. No. 84.

This general principle being established, we may go a step further and show, that. in point of fact. the convention had the English statutes in view, in determining· the nature and extent of the power they were granting to congress when the bankrupt clause was under consideration. Mr. Sherman observed, "that bankruptcies were, in some cases. punishable with death by the laws of England, and he did not choose to grant a power by which that might be done here. 3 Madison Papers, 1481. It thus appears that the laws of England were the laws referred to in regard to the definition and nature of the powers they were conferring. It may also be remarked, that Blackstone's Commentaries were in the hands of the members. and frequently referred to. This book contained a definition of a bankrupt. and a summary of the English laws on the subject. What, then. was the English law to which the convention referred, when they adopted the clause in regard to bankrupts? The English system, when the convention sat, had been in operation for several generations. and provided, in substance:—A proceeding by a creditor against a debtor, who is a trader. Distribution of a bankrupt's effects equally among his creditors. A discharge to be obtained by the debtor from his debts, upon obtaining the consent of a given majority of his creditors. It was a proceeding for the benefit of creditors, as are all laws for the collection of debts. of which this was one; but with liberality towards the debtor, who, by misfortune so frequently attending trade. became unable to pay his debts. in allowing him a discharge from those debts. upon obtaining the consent thereto of a given majority of his creditors. Even this provision for a discharge. we are told by Blackstone, was intended for the benefit of creditors, as it influenced debtors to act with economy. industry and honesty, and make a full surrender of their property, without which they

could not hope to obtain the consent of their creditors. The whole system was founded on the principle, that a trader who owed debts in the various parts of the country, and was fraudulently making way with his property, instead of paying his debts with it, should have that property taken away and placed in the hands of trustees, or other officers, with which his debts should be paid; and each of his creditors, whether absent or present, have his fair dividend. We are told by Mr. Madison, who has, not inaptly, been called the father of the constitution, that a uniform system of bankruptcy "would prevent so many frauds, when the parties, or their property, may lie or be removed into different states, that the expediency of it seems not likely to be drawn in question." Fed. No. 42. This reason for the adoption of the clause in regard to bankrupts, was published by Mr. Madison after the constitution was proposed by the convention, but before it was adopted by the states—was intended to explain the grant of power to congress, and to induce the states to accept the constitution, and no doubt had its effect. The frauds of whom—the removal of whose property, are here spoken of? Certainly the frauds of the debtor—the property of the debtor. We have another almost contemporaneous exposition of this grant of power to congress. It is the act of congress of 1800, "To establish an uniform system of bankruptcy throughout the United States." It is altogether, in its principal and material features, like the English system—a proceeding by creditors against debtors, who are traders —distribution of bankrupts' effects equally among creditors—a discharge of the bankrupt from his debts, on the consent obtained of a given majority of his creditors.

I have now, I think. shown that the bankrupt system intended by the framers of the constitution, and to establish which, power was given to congress, was a system for the benefit of creditors, to enable them to collect their just debts. and to prevent the frauds of debtors who might remove their property and themselves into different states.

I will now show that the act we are considering. is solely and entirely for the benefit of debtors, and to enable them to avoid their debts; and therefore opposition to the whole intent, spirit. and object of a bankrupt law. For this purpose, I will here further notice some of its provisions: 1st. The debtor selects his own time to commence proceedings—when he may have entirely squandered his property, and when nothing can be found. It is not even necessary that he should have been sued, or threatened with a suit. or ever asked for the debt. 2d. He is allowed to select the state and county where he will commence proceedings. For this purpose he can change his residence or business to any place he may think most favorable. He can thus go where nobody is likely to detect his frauds. 3d. He may

have spent all his property in idleness, riotous living, debauchery or gambling in stocks or wild speculations. It will not affect him; and he is entitled to his discharge, equally with the most prudent, industrious, and economical person. 4th. If he does not surrender to his creditors one cent's worth of property, he may have property reserved to him, to the amount of $300, for his own use; and also his wearing apparel, and that of his family, which has been held by some to include jewelry. 5th. If a majority of his creditors should object to his discharge, it will only give him an additional privilege—that of demanding a jury, and taking the cause away from the court. Or he may appeal, even before the cause is tried, and is allowed ten days to appeal in. No such privileges are given to creditors. 6th. After the court disposes of the matter, or decides the cause against him, and refuses the discharge, he can then have it referred to a jury, although already tried and decided by the court, which heretofore has never been allowed in any case, either in law or equity. The creditor is allowed no such privilege. 7th. In such cases, no provision is made by the act to allow the creditors a trial by jury. 8th. An appeal is given to the debtor—none is allowed by the act to a creditor. 9th. When the cause is removed into the appellate court, the debtor can demand either a trial by jury, or a trial by the court. The creditor has no such privilege. 10th. The debtor may take a chance of a decision in his favor, by the court—if in his favor it will be conclusive. If the court decides against him, then he may demand a jury, and have another chance. If the court decide against him he can have another chance by appeal. In the appellate court, if he thinks the court is likely, from previous decision, to be against him, he can take the chance of a jury. If he thinks the jury is likely to be against him, he can take his choice with the court. If some of these chances do not hit, there is no "uncertainty in the law." The creditor has no choice—any decision against him is to be final; and scarcely any in his favor is allowed to be final or conclusive. 11th. The English bankrupt law, and the act of 1800, gave the appointment of the assignee to the creditors, because they alone were interested. No such privilege is given by this act. 12th. The commissioner is to be appointed in the county where the bankrupt lives. 13th. There is no punishment for frauds. 14th. To conclude, the debtor is to get a discharge from all his debts, without the consent of any creditor. It applies to debts contracted before the passage of the act, and of which creditors could have had no idea at the time they gave the credit.

May I not here enquire, whether it is fair to construe this grant of power intended for the benefit of creditors, and to enable them to collect their just debts, so as to author-

ize the passage of a law solely for the benefit of debtors, and to enable them to avoid and discharge their debts? Again: a clause had been introduced into the constitution, prohibiting the states from passing any law impairing the obligation of contracts, because, as was said by the members of the convention, it was immoral, contrary to the first principles of justice; and a power that ought not to be exercised by any legislative body. Would the states have ratified the constitution, and submitted to such a prohibition on themselves, for such reasons, if they had understood that congress could, at its pleasure, under color of bankrupt laws, authorize the abrogation of all contracts? It has been said that the debtor is required by the act to surrender his property, and therefore, it would seem, it is not a violation of contract. I will presently show, on the highest authority, that a discharge, on the application of the debtor, from his debts, without the consent of his creditors, is not the less a violation of the contract, because there is a surrender of property, supposing the debtor to have any. But I wish now to enquire, whether there is anything in any system of bankruptcy known to the convention, which more required the surrender of property, than the consent of creditors, to a discharge from debts? And if the congress can authorize a discharge from debts, and dispense with the consent of creditors, why may it not authorize a discharge, and dispense with the surrender of property?

A question of much importance remains yet to be disposed of, whether the act violates contracts; and if so, whether the congress has authority, under the constitution, to pass a bankrupt act which violates contracts? The first branch of this question cannot be difficult to answer. With the mere moral obligation, however sacred, we have nothing to do; it is a matter in foro conscientiae, which congress could not destroy if it would. Ogden v. Saunders, 12 Wheat. [25 U. S.] 258, 337. It is the legal obligation which the laws have to do with. What is the legal obligation of a contract? It can be nothing else than the obligation of performance which the law imposes and enforces. An act, therefore, which declares that a person shall be discharged from all his debts, contracts, and engagements, and that no suit shall be maintained thereon; and this to apply to contracts entered into before the passage of the act; and also without performance or payment of the debt, and without the consent of the other party, would appear to be as clear a violation of the contract as could be imagined. It has been said that the surrender of property is a compliance with and fulfilment of the contract; and therefore, when that is done, there can be no violation of the contract. If A gives his note to pay B a sum of money on a certain day, it is difficult to

conceive how the surrender of property, which does not pay the amount of the note, or perhaps one cent in the dollar, can be a compliance with the contract. But the common sense, the experience, and the understanding of the whole community is opposed to this notion. The law existing at the time the contract was made, authorized no such thing. And do we not all know that thousands get credit on account of their industry and capacity for business, their supposed honor and integrity, and on the hitherto well founded opinion, that the law would compel the payment of just debts; and not merely, and frequently not at all, on the property they may happen to possess. Indeed, what signifies the requirement to surrender property, when it has already, in many cases, been spent in wild and visionary speculations, (differing but little from common gambling,) and extravagant living; and where, in nine cases out of ten, nothing is set forth in the schedules, but what the same act authorizes them to retain?

The supreme court of the United States has decided this matter. In Sturges v. Crowninshield [4 Wheat. (17 U. S.) 122] 4 Pet. Cond. R. 415, the court says: "A contract is an engagement in which a party undertakes to do or not to do a particular thing. The law binds him to perform his undertaking, and this is, of course, the obligation of his contract. In the case at the bar, the defendant has given his promissory note to pay the plaintiff a sum of money, on or before a certain day; the contract binds him to pay that sum on that day; and this is its obligation. Any law which releases a part of this obligation, must, in the literal sense of the word, impair it; much more must law impair it which makes it totally invalid, and entirely discharges it. It has been contended that, as a contract can only bind a man to pay the full extent of his property, it is a complied condition that he may be discharged on surrendering the whole of it. But it is not true, that the parties have in view only the property in possession when the contract is formed; or that its obligation does not extend to future requisitions. Industry, talents, and integrity, constitute a fund which is confidently trusted as property itself. Future acquisitions are, therefore, liable for contracts; and to release them from this liability impairs the obligation." The same principle is decided in McMillon v. Niell [4 Wheat. (17 U. S.) 209] 4 Pet. Cond. R. 424; and in Farmers' & Mechanics' Bank v. Smith [6 Wheat. (19 U. S.) 131] 5 Pet. Cond. R. 35.

The other branch of the question remains: Has congress authority to pass a bankrupt law, impairing or destroying contracts? It has been said that, although there is a provision in the constitution of the United States, which forbids any state to pass laws impairing the obligation of contracts, yet there is no such restriction of congress. This view of the subject makes it proper to look a little into the nature of the state and federal governments. The government of the United States was constituted for certain specified purposes; it can exercise no power that is not granted in the constitution; and therefore, when congress attempts to exercise a power, it should be able to point out the grant of that power in the constitution. The states, or the people of the states respectively, have all the power not delegated to the general government. This was the opinion entertained by the makers of the constitution, before the adoption of the 10th amendment, and arises from the very nature and object of the general government. By Mr. Madison, before the constitution was adopted by the states: "The powers delegated by the proposed constitution to the federal government are few and defined; those which are reserved to the state governments, are numerous and indefinite." Fed. 233; Fed. No. 84. But out of abundant caution the 10th amendment was adopted: "The powers not delegated to the United States by the constitution, nor prohibited by it to these states, are reserved to the states respectively, or to the people." By the supreme court of the United States: "The government of the United States can claim no powers which are not granted to it by the constitution; and the powers granted, must be such as are expressly given, or given by necessary implication." Martin v. Hunter [1 Wheat. (14 U. S.) 304] 3 Pet. Cond. R. 583.

It is therefore apparent there is no need of any restriction on congress in regard to the power to impair contracts. If the power is not granted in the constitution, it does not exist. A restriction on the states was necessary, and was inserted in the constitution (article 1, § 10): "No state shall pass any law impairing the obligation of contracts." It is not pretended there is any express grant of power to congress to impair or annul contracts. It must, therefore, if it exists, be necessarily implied from the grant of some other power; and can only be so implied, and is only claimed as far as regards this case, from the "power to establish uniform laws on the subject of bankruptcies." Does, then, the power to establish uniform bankrupt laws necessarily imply a power to annul contracts? So far from a bankrupt law necessarily implying a breach of contract, it surely does not imply it at all. I have already shown that the bankrupt laws of England, in existence for many generations before the convention sat, were laws for the benefit of creditors,—intended to enable them to collect their debts from those who were squandering their property instead of paying their debts, or were practising frauds; and that they required the written assent of a ma-

jority (four-fifths) of these creditors to a discharge, and that it should also appear the debtor had acted fairly; and that the bankrupt law passed by congress in 1800, was substantially the same in effect. Bankrupt laws never were considered in England as violating contracts. They authorized a proceeding by the creditors, and for the benefit of the creditors; and they could not complain. The bankrupt was only required to perform his contract; and he could not complain. Where then could there be a violation of contract? If it be said that a creditor, not consenting to discharge, might complain of a breach of contract when his debt was discharged, it can readily be answered that, the proceeding being by the creditors for the common benefit, a majority in their case, as in all cases where those having a common interest act for the benefit of all, must govern. This principle lies at the foundation of our government. It is a government of the people: the people make the laws; yet all may not consent. Taxes are laid only by consent of those to be taxed; yet every individual does not give his consent. "Government derives its just powers from the consent of the governed;" yet all do not consent. If a majority of the creditors were not allowed to act in a proceeding for the benefit of all, the interest of all might be sacrificed by the obstinacy of a single creditor. The act of the majority is therefore considered the act of all. Nor was there a hardship on any creditor; for the English law required four-fifths to consent, and the act of Congress of 1800 required three-fourths. I repeat, therefore, that the bankrupt laws of England were never considered as violating contracts; and it is believed no writer or judge can be named who so declared; indeed, this I believe is conceded. See opinion of Mr. Justice Johnson in Ogden v. Saunders, 12 Wheat. [25 U. S.] 287. There is another view of this part of the subject. The supreme court of the United States have decided—and declared it to be the settled opinion of the court—that a bankrupt law which applies only to contracts made after its passage does not impair the obligation of contracts, on the principle that those who enter into contracts have an eye to the laws under which they are made, and are to be executed. Ogden v. Saunders, 12 Wheat. [25 U. S.] 213. How, then, can it be said that the power to pass a bankrupt law necessarily implies a power to violate contracts?

I will go further, and show that the grant of power to congress to establish uniform bankrupt laws, could not have been intended, either by the convention which framed, or the states which adopted the constitution, to authorize congress to pass a law to violate or annul contracts. That such a power was viewed by them as immoral, unjust and mischievous in the high-

est degree; a power that could be exercised only for evil, and never for good, and that no legislative body ought either to possess or exercise it. The congress of the old confederation adopted on the 13th July, 1787, a constitution or ordinance for the government of the territory of the United States, northwest of the Ohio river. In this they ordained and declared certain great, moral and political principles, "which shall be considered as articles of compact between the original states and the people and the states in said territory, and forever remain unalterable, unless by common consent." Among which is the following: "And in the just preservation of rights and property, it is understood and declared that no law ought ever to be made, or have force in the said territory, that shall in any manner whatever interfere with or affect private contracts or engagements, bona fide, and without fraud previously formed." Here was a great principle, established by the people of the United States. It is also well known that many of the most distinguished members of the convention were members of the congress. In the same year the convention which formed the constitution sat, and on the 1st Sept. the clause in regard to bankruptcies was inserted in the constitution. Can it be supposed that the people of the United States would declare this great principle, which was "forever to remain unalterable, unless by common consent," and then in one month and a half authorize congress to pass bankrupt laws to violate contracts? And this, too, by the constitution, which in the second line, they have assured us was made "to establish justice" and in violation of what they had declared was "the just preservation of rights and property!" And for what was this great and sacred principle to be overturned? To enable congress to establish uniform laws on the subject of bankruptcies! a thing deemed of so little consequence itself, that it was not even mentioned until all the plans and principles had been submitted, debated and voted on; and not until the principles to be inserted in the constitution had been established by votes of the convention, and referred to a committee of detail, and reported on by that committee. See Madison Papers.

May I stop here to inquire, whether that compact has ever been altered by the common consent of the original states, and the people and states in said territory; now four states and a territory? Fortunately for the character of the august body that framed the constitution, we are not left in conjecture as to their intention on this subject. A clause was introduced into the constitution, declaring that "no state shall pass any law impairing the obligation of contracts." Was this clause introduced because the state could not be trusted, or because it contained a great principle of jus-

tice, which no legislative body should violate? The answer is this—it was a great principle of justice, which no legislative body should be permitted to violate; and an express provision to restrain the states was introduced, because they would retain all the power which was not granted to congress, or in regard to which they were not limited; and the prohibition was not extended to congress, because congress would only possess the powers which were granted by the constitution. No power had been granted to impair contracts; and, therefore, any limitation of, or restriction on such power, would have been useless, and perhaps mischievous, as the limitations might imply the grant of the power.

Hear Mr. Madison, the father of the constitution: "Bills of attainder, ex post facto laws impairing the obligation of contracts, are contrary to the first principles of the social compact, and to every principle of sound legislation. The two former are expressly prohibited by the declarations prefixed to some of the state constitutions, and all of them are prohibited by the spirit and scope of these fundamental charters. Our own experience has taught us, nevertheless, that additional fences against these dangers ought not to be omitted. Very properly therefore, have the convention added this constitutional bulwark, in favor of personal security and private rights; and I am much deceived, if they have not, in so doing, as faithfully consulted the genuine sentiments, as the undoubted interests of the constituents. The sober people of America are weary of the fluctuating policy which has directed the public councils. They have seen with regret, and with indignation, that sudden changes, and legislative interferences in cases affecting personal rights, become jobs in the hands of enterprising and influential speculators, and snares to entrap the unwary; [2] [the more industrious and less informed part of the community. They have seen, too, that one legislative act is but the first link of a long chain of repetitions; every subsequent interference being naturally produced by the effects of the preceding. They very rightly infer, therefore, that some thorough reform is wanting, which will banish speculations on public measures, inspire a general prudence and industry, and give a regular course to the business of the society." Fed. No. 44, p. 224.

[This was written after the adjournment of the convention, but before the constitution was adopted by the states; and is the contemporaneous exposition of the constitution by the father of the constitution. I have given the whole of this passage, for every word and sentence should be weighed and understood. "A law impairing the obligation of contracts" is declared to be "contrary to the first principles of the social compact, and to every principle of sound legislation;" and ad-

[2] [From 1 Pa. Law J. 344.]

ditional fences and constitutional bulwarks in favor of personal liberty and private rights were added. And yet it is contended that this very convention inserted into the constitution a provision to authorize congress "to impair the obligation of contracts;" and Mr. Madison himself voted for it! See Madison Papers, 1448, 1481. Very singular "additional fences and bulwarks in favor of private rights!" Their "regret and indignation at legislative interferences affecting private rights" had suddenly evaporated. They forgot their fears of "jobs in the hands of enterprising and influential speculators." Can these opinions be tolerated for one moment? And this, too, of a body of men distinguished, beyond all which ever existed, by wisdom, patriotism and disinterestedness?

[We have also the opinion of the supreme court of the United States, as to the intention of the convention in inserting the clause that no state shall pass any law impairing the obligation of contracts. In Sturges v. Crowninshield, 4 Pet. Cond. R. 420, the supreme court says: "To restore public confidence completely, it was necessary not only to prohibit the use of particular means by which it might be effected, but to prohibit the use of any means by which the same mischief might be produced. The convention appears to have intended to establish a great principle—that contracts should be inviolable." Again: "These words prohibit the passage of any law discharging a contract without performance." Id. 421. Where was the establishment of the great principle? And how were contracts to be inviolable, if the power had been granted to congress to violate them, or impair their obligation, under color of a bankrupt law? What is meant by the inviolability of contracts? The court has told us. It is the prohibition of "any law discharging a contract without performance." In principle, there can be no difference between the right to a piece of property, and the right to the price of that property when sold. I have a right to my land, and an equal right to the price of that land, should I sell it. Indeed, the right to either generally depends on contract; and they are both considered rights of property. In Wilkinson v. Leland, 2 Pet. [27 U. S.] 627, the supreme court of the United States says: "That government can scarcely be deemed to be free, where the rights of property are left solely to depend upon the will of a legislative body, without any restraint. The fundamental maxims of a free government seem to require that the rights of personal liberty and private property should be held sacred. At least, no court of justice in this country would be warranted in assuming that the power to violate and disregard them—a power so repugnant to the common principles of justice and civil liberty—lurked under any general grant of legislative authority, or ought to be implied from any general expressions of the will of the people. The people ought not to be presumed to part with

rights so vital to their security and well-being, without very strong and direct expressions of such an intention." Those who claim this terrible power for congress—a power which, if it exists, would, according to the above opinion, prove us to be scarcely free, and which is declared to be contrary to the fundamental maxims of a free government—are obliged to claim it, not as lurking under any general grant of legislative power, or as being implied from any general expressions of the people; but as derived from a grant of power, which I have already shown, has been exercised in the country from which we borrowed our system of jurisprudence and laws, for many generations, without ever there being understood as implying any such power. From a general grant of legislative authority, the power to pass laws which would impair the obligation of contracts might be inferred; but from a grant of power in favor of contracts, and to enforce and carry them into effect, it would, I think, be monstrous to imply a power to destroy them.

[The people of the several states were content that their legislatures should be prohibited from passing odious and tyrannical laws; and hence they adopted the constitution with the clause in favor of personal liberty and private rights—that "no state shall pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts." They were assured, and no doubt believed, that the acts therein prohibited "were contrary to the first principles of the social compact, and to every principle of sound legislation;" and were prohibited for that reason. But suppose, when the conventions in the several states assembled to consider of, and accept or reject the constitution thus offered to them, they had been informed that this power of doing mischief had been prohibited to them, but had been granted to the congress, by which the evils apprehended might be extended in one hour all over the Union; and that it was only the states which could not be trusted in regard to private rights:—what would they have said, and what would they have done? It is well known that in many, if not all of the state conventions, there were numbers of powerful and vigilant opponents to the constitution. Would they have adopted the constitution—and that, without one word of comment or objection on account of such glaring inconsistency on the part of the federal convention, and such implied insult to the states? The truth, however, seems to be, it was reserved for modern times to make the discovery that the power to violate contracts was a necessary incident to the power to pass a bankrupt law, and was alike unknown in the United States and in England at the time of the adoption of the constitution; and that when the convention permitted the states to retain the power to pass bankrupt laws, and prohibited them the power of violating contracts, and gave the power to congress to pass bankrupt laws, and did not also grant the power to violate contracts. it was believed the one power was either necessary or proper to the exercise of the other.]³

It was said by Mr. Madison that "one legislative act (interfering with contracts) is but the first link in a long chain of repetitions; every subsequent interference being naturally produced by the effects of the preceding." If the present act be sustained by the judiciary and tolerated by the American people, we may expect to see, on the part of congress, bankrupt laws which will discharge contracts without a surrender of property; and, if the present act be constitutional, no court can say the other will not be so. And on the part of the states, we may see their debts generally repudiated, there being no reason why the people of the states in their collective capacity, should not be discharged from their debts, as well as the same people in their individual capacities. If it be right in the latter, it must be so in the former case. In a moral point of view, perhaps, there is in some cases, less objection to the discharge of the debts of the community, than to those of individuals; for, in the former case, the generation called on for payment, may not be the one which incurred the debts, and may have received little or no advantage therefrom—whereas, an individual is never called on to pay a debt, which he did not contract, unless it be the debt of an ancestor, who not only obligated him to pay, but left abundant means so to do. A state frequently has nothing but its future acquisitions arising from taxes the fruits of the industry of its citizens to pay enormous debts contracted by another generation. The individual, even if he surrenders his property, has his future acquisitions, also, arising from his industry. Thus, if the present law be justifiable and constitutional, so would laws be justifiable on the part of congress and the several states, repudiating their "debts, contracts, and engagements." But one of the remarkable inconsistencies of the times is, that those who are loudest in denouncing repudiation by the states, are the loudest, also, in approving repudiation by individuals.

I have not said anything in regard to the distinction between bankrupt and insolvent laws; not but what there is a plain and obvious distinction; and, not but what the act of congress has many of the features of an insolvent law, the power to pass which, I think, is reserved to the states, but because the present act, take it altogether, according to my view of the subject, is neither a bankrupt or insolvent law, but simply an act to discharge debts without payment. If the congress instead of entitling the act, "An act to establish a uniform system of bankruptcy," had given it a title corresponding with its provisions—"An act to discharge debts without payment,"—but little difficulty would have arisen. We are told by the supreme

³ [From 1 Pa. Law J. 344.]

court of the United States, in Craig v. Missouri [4 Pet. (29 U. S.) 410] that the constitution was intended to prohibit things, not names; and that the giving a new name to an old thing would not take it out of the prohibition of the constitution. If the giving a new name to an old thing would not change the case, I presume the giving an old name to a new thing would hardly change it. [Craig v. Missouri] 4 Pet. [29 U. S.] 433.

We have been sometimes told that the constitution referred to the colonial laws, when it adopted the provision in regard to bankruptcies. Again, we are told that every civilized nation had its bankrupt laws, and that the convention did not confine itself to the English law. In the examination I have been able to give the laws of the colonies and the laws of the states up to the year 1787, in which year the convention sat, I have not been able to find any law like the act under consideration. They have not told which of the colonial acts they refer to—by what colony passed, or when passed. But suppose we were able to find a solitary act like the one under consideration. I have already shown that, as it impaired the obligation of contracts, it was according to the oft repeated decisions of the supreme court, condemned by the constitution. An act condemned by the constitution, is then the act to which the convention referred as a pattern. The convention brands such an act, as "contrary to the first principles of the social compact and to all the principles of sound legislation," prohibits it to the states, and at the same time adopts its principles for legislation by congress.

Again, as to the bankrupt laws of civilized nations, they cannot certainly refer to the great and wise system of laws called the civil law: the basis of the laws of most of Continental Europe. The "cessio bonorum" of the Roman or civil law, allowed a discharge from imprisonment, but the future acquisitions of the debtor were liable for his debts. The civil law had no other system. Coop. Just. p. 345, par. 40. This was also the law of France, Germany and Holland, and generally of Continental Europe. The English insolvent system, Act 32 Geo. II. (commonly called the "Lords' Act"), and the more recent English statutes of 33 Geo. III., 1 Geo. IV., 3 Geo. IV., and 5 Geo. IV. have gone no further than to discharge the debtor's person. So of the insolvent laws of Scotland. 1 Kent, Comm. 422. Thus we find no law to which the convention could have had reference, like the present act of congress. The truth seems to be, that this rejection of a certain and known standard of meaning. found in the English bankrupt laws, and referring the question to laws. God only knows when and where passed, or where they exist, is only intended to give unlimited power to congress over all the contracts and business of the country. And we have been told by Junius, and the present act will illustrate it, that

persons are never very anxious to secure power who do not intend to use it.

I will here notice a different view of the powers granted to congress by the constitution, in regard to bankruptcies, taken by an eminent jurist. In 3 Story, Comm. pp. 13, 14, in note 3, it is said: "Perhaps as satisfactory a description of a bankrupt law as can be framed, is that it is a law for the benefit and relief of creditors and their debtors in cases in which the latter are unable or unwilling to pay their debts. And a law on the subject of bankruptcies, in the sense of the constitution, is a law making a provision for cases of persons failing to pay their debts." It will be apparent to the most superficial thinker, that this definition or description, like many of the doctrines and opinions of that eminent jurist, would infallibly draw into the vortex of federal power, the whole business of the country. Every case of the non-payment of a debt, is a proper subject for a law of congress and for the jurisdiction of the federal courts. No act of bankruptcy—no insolvency—no act of fraud or removal of property is necessary to give congress and the courts of the United States jurisdiction. Any "person failing to pay his debts," is the subject of a bankrupt law. A citizen worth a million, who lets a day pass over after a debt of one dollar becomes due, is a bankrupt and the subject of a bankrupt law—the whole of his property may be taken away and given to an assignee. Congress can thus regulate all the business of the country and the collection of all debts; and whenever it pleases, discharge all debts without the consent of the creditors or the surrender of property—for neither are necessary according to this definition. What an immense train of criminal law may also follow. I have already shown that the grant of power in regard to bankruptcies, was not considered of any importance by the convention; and, notwithstanding the violent objections to parts of the constitution and the great jealousy entertained of many of its provisions affecting the rights of the states, yet no one seemed to consider the bankrupt clause of sufficient importance to merit an objection. As Mr. Madison said: "The expediency of it seems not likely to be drawn into question." Yet, this spot in the heavens, no bigger than the ox's eye, "has now become a vast and portentous cloud from which a tornado may issue that will bury in ruins all the reserved rights of the states."

We have been often told that a constitution cannot go into detail; it can only contain principles; and therefore in the interpretation of it, we must look at its intention and spirit. He that will thus interpret the constitution of the United States will hardly be able to come to the conclusion of the learned jurist, that his description of a bankrupt law, in the sense of the constitution. "is as satisfactory as any that can be framed." Indeed, the government of the United States, with such interpretations, would shortly be a government

without limit. Surely if the convention had intended to give the United States jurisdiction in all cases of indebtedness, it was idle to define with such precision the powers of the judiciary; and worse than idle to specify only one class, and that a very small class of debtors, to wit, bankrupts. Nor can I imagine that the states would have adopted the constitution, without objection to a power so unnecessary to the government of the United States, so unlimited and so portentous. I confess, however, that I am no latitudinarian in my construction of the powers granted to the government of the United States. I believe it should be confined within the grants of power; and if more power be necessary, let it be granted by amendments, and not usurped; for one usurpation will be but a link in a long chain of usurpations, until, at last, the government of the United States will be as unlimited as that of Turkey or Russia.

I have thus given, generally, my views on this subject, and it now only remains to notice some of the objections to those views, presented by the very able argument at the bar. It is said "that the word bankruptcy, has a legal and also a common signification." It seems to be admitted, that we are to look to the English law, as it existed at or before the time of the convention, for the legal meaning. But, "it is said the convention used the word in its common meaning; and that the common meaning is insolvency, bankruptcy—inability to pay debts," &c. The answer to this seems not very difficult. The convention were applying the word to a legal subject—the making laws in regard to bankruptcies. They were defining the nature and extent of the laws in regard to that matter, which might be made by congress. Now, the term had a certain, precise and fixed legal meaning, and had been thus certain, precise, and fixed for nearly 200 years. This was well known to the convention. The book which contained the law and the definitions, and was then and is yet of the highest authority, · was in the hands of the members, and was frequently referred to by them. It was not only in the hands of the members, but of every person of the least pretension to learning. It appears that the members were exceedingly anxious to select words which would mark with certainty and precision the grants of power they were making. The chairman of the committee (Mr. Rutledge) to which the subject was referred, and who reported the phrase now in the constitution, received his legal education at the Temple, (London.) Can we suppose for a moment, that the legal signification was rejected, and the common signification taken? This common signification was uncertain and indefinite, and nearly as various as the different lexicons. By adopting the legal signification, you preserve the inviolability of contracts, which has been shown to have been a great object with the convention; you avoid uncertainty; you leave the states in possession of their just and necessary powers in regard to contracts and the collection of debts, and leave the United States in possession of all power necessary to be used by a general or national government—which of course can be·only power of a general or national character.

It is said also, "that bankruptcies include insolvencies; and of course, that congress has power over both." I have already shown that Blackstone's Commentaries, a work of the highest possible authority, was in the hands of the members of the convention, and frequently referred to. I will here give the definitions of both words, as contained in that work. "Bankrupt, a trader who secretes himself or does certain other acts tending to defraud his creditors." 2 Bl. Comm. 285. "Act of insolvency—which is an occasional act frequently passed by the legislature, whereby all persons whatsoever, who are either in too low a way of dealing to become bankrupts, or not being in a mercantile state of life are not included within the laws of bankruptcy, are discharged from all suits and imprisonment. upon delivering up all their estate and effects to their creditors, upon oath." 2 Bl. Comm. 484. Here it will be seen, that insolvency, which is inability to pay debts, has nothing to do with bankruptcy. In fact, bankrupts are frequently far from insolvent. It is the commission of acts tending to defraud creditors, which makes bankrupts, and no such act is required to make an insolvent. Insolvents are only discharged from imprisonment.

Here, then, is jurisdiction given to congress over a small—a very small—class of debtors: "Traders who secrete themselves, or do certain other acts tending to defraud their creditors;" and the attempt is now made to take jurisdiction, or assume power over all insolvents. Let us notice the relative numbers of each class. There are now, in this court. near about nine hundred cases. Of these, two are involuntary bankrupts— or bankrupts proper—and the remainder are insolvents; that is, one bankrupt to four hundred and fifty insolvents. But Mr. Story proposes to extend it, or maintains that it is already extended by the constitution. to all cases of persons failing to pay their debts, without regard to insolvency even. This would extend the powers of congress and the federal judiciary, in ordinary times. over, I presume, two thousand cases, for every case of bankruptcy proper; and. of course. diminish the power of the states in the like proportion. The power, if it exists at all in the congress and United States' courts, is supreme, and can annul all the laws of the states as to property and suits. It is already declared, we are told, from the bench of some of the United States' courts, that the insolvent laws of the states are wholly abrogated. and every thing done under them, since the bankrupt act went

into effect, is a nullity. Thus, all the business of the country, and of course the property, is to be drawn into the vortex of federal power. If the constitution intended to give the jurisdiction in all cases of insolvency, as well as bankruptcy, or as Mr. Story would have it, in all cases of failure to pay, without either bankruptcy or insolvency, it would have been as easy to say so, as to say what it did say. But would the states have submitted to a power so unnecessary in congress, so dangerous, and so prodigious in extent? Look at the consequences. Here is a state of upwards of 70,000 square miles in extent; all the business in regard to insolvents as well as bankrupts is to be transacted in the United States' court, at the city of Jefferson. All who have an interest in a case, either as petitioners or creditors, must go to that court, and there remain, perhaps with a number of witnesses; delayed by the accumulation of business in the one court, for months. How would it be if, according to Mr. Story, the power extended to all cases of failure to pay a debt, as well as to cases of insolvency and bankruptcy. In a few years we would see half the people of the states attending court at the same time; and suits, by the accumulation of business, would be delayed in that court, as they were in the court of chancery in England, for fifty or sixty years. In the mean time, the laws of the state, like those of a colony or a territory, would be, as far as concerned these subjects, entirely abrogated. Is this like having ten or fifteen circuit judges, one of whom travels into each county three times a year—a county court also in each county, and justices of the peace in each township—bringing justice to every man's door? It is said, "that the power to annul contracts between individuals, is a necessary power, and unless the congress possesses it, it has been annihilated."

If what the supreme court of the United States and Mr. Madison have said, in the passage already quoted, be correct. it would follow that the convention were of the opinion, the power to annul the contracts of individuals might well be annihilated. I do not, however, say that the United States, under the treaty-making power, might not for great national purposes, impair the obligations of or annul certain contracts. But it would be done for the good of the public, and the United States would be bound to make good the loss to individuals. The 5th amendment to the constitution provides that private property shall not be taken for public use. without just compensation; and certainly under this general phrase, would be included the rights of contracts. And this may be another cause for there not having been inserted in the constitution, an express prohibition of congress, in regard to impairing the obligation of contracts. If the government of the United States, in the time even of its greatest need, cannot take private property for the public use. without just compensation, and without any benefit to the public. I think, therefore, that the power to take one man's property and give it to another, and to absolve a man from his just debts and contracts without compensation, is, and should be annihilated in these United States. It is said, "that if the power be given, it is no answer to object that it may be abused, or rather that because it may be abused does not prove that it was not granted, for that any power may be abused." That is granted. But when we are inquiring what power was intended to be granted by certain words; and, if we attach a particular meaning to the words, it will amount to a grant of power, both unnecessary to that government, and dangerous, and inconsistent with the nature and objects of the government; contrary to the sentiments expressed by the founders of that government, and such as would lead to consolidation, we should reject such interpretation if another interpretation may be given, which is unexceptionable. It is said. "the people of the U. S. would not have adopted the constitution, if it had been understood; that we were bound to the English system of bankruptcy, as it existed at and before the time the convention sat, and which could not be altered or amended." No one, I believe, has maintained that the English system of bankruptcy was adopted in regard to details. It is provided in the 6th amendment to the constitution, that in criminal prosecutions the accused shall enjoy the right to a trial by jury; and the 7th amendment provides for the trial by jury, in suits at common law, where the amount in controversy exceeds twenty dollars. Now, no one has contended that we were bound to summon and empannel a jury, as in England; or that the qualifications of jurors must be the same. But all agree that the substance of the trial by jury, as known and established in England for several hundred years. must be preserved. Could congress direct a trial by jury, and provide that the jury should consist of three men; and that a majority should convict? No person will assert the affirmative. If the parliament should change their trial by jury, and provide that a jury should consist of three men, and that a majority should convict, would congress be at liberty, also to change our trial by jury, in the same way? No person will assert the affirmative.

If congress cannot change the system of jury trial, in substance, can it change the system of bankruptcy in substance? As gentlemen think a much better system of bankruptcy is discovered, than that known to our ancestors, and which was adopted by the convention, so, no doubt, they will discover a much better system of trials than that by jury. But I think we are deprived, in both cases, of the benefit of their discoveries, by the provisions of the constitution. It is said, "that any bankrupt law, which is retrospec-

tive, impairs the obligation of contracts, where there is a minority not consenting to the discharge." This may be the case, and candor obliges me to say I entertain doubt on the subject; yet it does not affect the argument. As a bankrupt law is intended, like all other laws, for the collection of debts, for the benefit of creditors; and as, in this case, they have to act together for the benefit of all; and some three-fourths or four-fifths are to consent to a discharge, which is still for their benefit, has any one creditor a right to complain of a mere technical disregard to his contract? The proceeding is, in truth and fact, for his benefit; a given majority must consent, and it must fully appear, that the bankrupt has acted honestly. The constitution was intended to establish principles, not technicalities; and where the substance was taken care of, it might well disregard the shadow. But if it be a violation of contract it can be only to the extent known to a system of bankruptcy, which is merely technical, and cannot be made, by any just interpretation, to extend to a substantial violation, and entire abrogation of the contract, to the ruin of all the just hopes and expectations of the creditor.

It has been said, "that all the power in regard to bankruptcies is given to congress with only one exception; that of uniformity—and that we are not at liberty to make another exception, that it shall not violate contracts." It is admitted that the power is given with only the one exception, but still it is only the power to pass a uniform bankrupt law. What constitutes a bankrupt or bankruptcies is the question we are considering. If a bankrupt law, within the meaning of the constitution, does not substantially violate contracts, then the power to violate contracts, is not given. It is not an exception, or thing taken out of the grant—but never was included in it. This, however, is an exceedingly technical interpretation, is unworthy of the subject, and can never be applied to a constitution, which can only embrace principles. We must look at the spirit of the instrument, and the intention of its authors. It has also been said, "that as congress had authority to pass bankrupt laws and violate contracts, every person who made a contract must have made it with an eye to this power in congress, and the act, when passed, cannot therefore be considered retrospective." Now, the doctrine of the supreme court on that subject, as already shown, is that a law in existence when a contract is made, becomes part of that contract. But how a power not exercised, or a law not in existence at the time a contract is made, can become part of that contract, is beyond my comprehension. But it is also a begging of the question. The question is, whether congress has power, under color of a bankrupt law, to violate contracts. The gentlemen assume that congress has the power, (the matter in dispute,) and then say every

one who contracts must be presumed to contract with an eye to that power. It is further said, "that the convention in New York, which ratified the constitution for that state, proposed an amendment limiting bankrupt laws to traders, and that it was not adopted." This not only proves the convention in New York believed the system ought to be limited to traders, but that there was doubt whether it was so limited, and should be placed beyond doubt. That it was not adopted by the necessary number of states, three-fourths, only proves that they did not think there was any doubt, or that it should be left as it was, whatever it might be. If they had adopted the amendment proposed, it would have been taken as an admission that the English system had not been adopted by the constitution; which, I presume, they would neither have admitted then, nor would they do so now.

I have deemed it necessary to a correct understanding of the subject, to examine generally the doctrine in regard to bankruptcies, but intend to confine the opinion to the case now before us. The court regrets exceedingly that an imperious sense of duty compels it to declare that the act of congress so far as it undertakes to discharge a debtor from debts contracted before the passage of the act, without payment, and to discharge his future acquisitions of property from liability to those debts, without the consent of a given majority of his creditors, in unconstitutional.